## Bayard Stockton and LeRoy H. Anderson, Trustees for the Children of Sarah J. Conover, v. Peter Fortune et al.

1. PAYMENT—*To Agents Without Authority.*—As a general rule, in the payment before maturity of a debt secured or evidenced by a written instrument, the possession of such instrument by the alleged agent is indispensable evidence of his authority to receive payment thereon in order to enable the debtor paying to rely upon appearances of authority in the absence of an actual authority established.

2. ESTOPPEL—*Of Principal to Deny the Authority of His Agent.*—In

order to protect himself, a debtor who has relied upon appearances of an agency and seeks thereby to estop the alleged principal from denying the agency, it is sufficient for the purposes of this case, to say that the fact that the instruments in question were in the hands of the principal and not in the possession of the agent at all, is controlling.

**Foreclosure**, of trust deeds. Trial in the Circuit Court of Cook County; the Hon. EDWARD F. DUNNE, Judge, presiding. Hearing and decree for defendant; appeal by complainants. Heard in this court at the October term, 1898. Reversed and remanded with directions. Opinion filed April 17, 1899.

**Statement of the Case.**—This suit was begun by a bill of complaint filed by appellants to foreclose two trust deeds, given to secure notes made by Mrs. Emma A. Leahy to appellants, and conveying property now owned by appellee Peter Fortune.

Some time after Mrs. Leahy had executed the trust deeds in question, she conveyed the property to appellee Fortune, and at the time of this purchase and sale, appellee Fortune paid to one Isaac E. Adams the entire amount of the purchase price, part of which Adams pretended to receive as agent of appellants, holders of the trust deed securities, and part as attorney in fact of Mrs. Leahy, the grantor of the fee. Adams, as trustee, released the trust deeds in question. Adams appropriated to his own use the moneys paid to him by appellees to take up the notes and pay the indebtedness in question. The notes had not then matured.

The only question in controversy is as to the authority of Adams to collect the trust deed indebtedness for appellants, and to release the trust deeds. In other words, the controversy is as to whether the payment by appellee Fortune, to Adams, was effective as a payment to appellants. The promissory notes secured by the trust deeds, and which evidenced the indebtedness in question, were not due by their terms, and were not in the possession of Adams at the time of the payment to him by Fortune of the amount of indebtedness which the notes represented. The notes were in the possession of appellants, and had been continuously in their possession since the making of the loans to Mrs. Leahy.

As tending to show the agency of Adams and his authority to collect the indebtedness represented by these notes, a series of letters, constituting a correspondence between Adams and appellants, was introduced in evidence. The only material evidence as to the authority of Adams consists of this correspondence and the testimony of Hamilton and appellants. The master in chancery, to whom the cause was referred to hear evidence and report conclusions, found that Adams was not authorized to accept payment for appellants, and recommended a decree for appellants, the complainants in the bill to foreclose. The trial court sustained exceptions to the report of the master in chancery, and entered a decree dismissing the bill of complaint of appellants for want of equity. From that decree this appeal is prosecuted.

MONTGOMERY & HART, attorneys for appellants; HATCH & RITSHER, of counsel.

Possession of the securities is, in the absence of actual authority, or a known course of dealing, indispensable evidence of authority to receive the principal of the debt. Stiger et al. v. Bent, 111 Ill. 328; Henn v. Conisby, Cases in Chancery, 93; Wolstenholm v. Davies, Freeman Ch., 289; Frank et al. v. Tuozzo et al., 50 N. Y. Sup. 71; Williams v. Walker, 2 Sand. Ch. 359; Cooley v. Willard et al., 34 Ill. 68; Garrels v. Morton et al., 26 Ill. App. 433; Viskocil v. Doktor et al., 27 Ill. App. 233; Smith et al. v. Hall, 19 Ill. App. 17; Thompson et al. v. Elliot, 73 Ill. 221; Thornton et al. v. Lawther et al., 67 Ill. App. 214, 169 Ill. 228

A release of a trust deed by the trustee when the note thereby secured has not been paid to the owner of it, and such owner has not authorized it, has no effect as between the parties or subsequent purchasers with notice. Stiger et al. v. Bent, *supra;* Conn. Gen. Life Ins. Co. v. Eldredge, 102 U. S. 545.

FREDERICK S. BAKER, attorney for appellees, contended that the principal will be bound by payment to his agent before

maturity, if from the course of dealing between him and his agent it can reasonably be inferred that it was intended that he was to have such authority.    Thompson v. Elliot, 73 Ill. 221.

If the evidence shows that the agent was the general agent of the mortgagee to accept payments of principal and interest upon loans negotiated by the agent, the mortgagee will be bound by a payment made to the agent.    Security Co. v. Richardson, 33 Fed. Rep. 16; Kent v. Congdon, 33 Fed. Rep. 228; Verdine v. Olney, 77 Mich. 310, 43 N. W. Rep. 975.

The first case is in many respects a parallel case with the case at bar.    Security Co. v. Richardson, 33 Fed. Rep. 16.

Mr. Justice Sears delivered the opinion of the court.

In order to hold that the payment by appellee to Adams was effective as a payment to appellants, it must be found either that Adams was in fact authorized by appellants to receive the payment, or that he was put in such apparent authority by acts of appellants as would preclude them from now denying his authority.

In passing upon the first question, viz., whether Adams was in fact authorized by appellants to receive this payment, we have to consider two questions: first, whether the receiving of the payment was within the scope of any general agency of Adams; and, secondly, if not, whether there was any specific authorization to do this particular act.

It would seem to be clear and undisputed from all the evidence, that there existed no general agency by which Adams was empowered to receive on behalf of appellants, payments like the one in question.    Hamilton, who was the law partner of Adams, testified that he "thought" Adams was the agent of appellants, and described the method of business between Adams and appellants:

" The business relations consisted in the making of loans and in collecting interest, and all the incidents of that business; the examination of titles, reporting on values, executing the loans and obtaining money from Stockton and Anderson (appellants), and delivering it to the borrowers; collecting

the coupons for interest and forwarding it to Stockton and Anderson. * * * My recollection is that when a loan was maturing, if it was desired to renew it, Stockton and Anderson were simply informed of that fact, and they agreed or not, as they might choose. * * * After the completion of the loans, the abstract of title and opinion and the trust deed recorded and the estimate of the value and the report on the property, if such a report had not been forwarded before, were put together, and usually I think a draft with them or inclosed in another cover at the same time were forwarded to Stockton and Anderson, and the notes doubtless also. Doubtless the trust deed may have been forwarded at a date later than the notes sometimes. My recollection is, though, that the trust deeds and notes were taken and signed first, and put on record, and then the abstract was brought down and examined. * * As to whether the draft upon Stockton, which I referred to, was in his hands, together with all the securities, before the money was paid him, I think that was the way the money was almost always obtained; by draft on Stockton and Anderson, drawn by Adams, either accompanying or following the papers relating to the loan."

Hamilton also testified to the contents of a letter from appellants, in which it was stated that Adams personally, and not the firm of Adams & Hamilton, represented appellants.

Appellants testified, and each of them denied that Adams was their agent. The substance of the testimony of each is to the effect that Adams merely presented loans to them, which they accepted when they so chose.

Without discussing the very lengthy correspondence between Adams and appellants, it is enough to say that it does not disclose any general agency which embraced within its scope the accepting on behalf of appellants of payments of loans before maturity.

One letter from Adams to appellants specifically negatives the existence of any such power. The letter is dated October 10, 1889, and contains, among other matters, the following, referring to the loan in question:

" Mrs. Leahy has been made an offer for her property, and buyer desires to pay cash. I have stated that without

your consent I have no power to release, but that I would lay the matter before you."

After a careful examination of all the evidence, it seems to us conclusive that Adams was not empowered by any general·agency to accept payment of loans before maturity and release securities upon same. Nor is there any evidence which we regard as establishing a specific authority in this particular instance to receive the amount of this indebtedness or to release the security of the same. The only evidence bearing upon the question of such specific authority is contained in the correspondence. The following letters are relied upon by appellees as indicating that appellants authorized Adams to receive this money and release the trust deeds. In the letter referred to, of October 10, 1889, Adams submitted to Stockton the proposal to accept payment of this loan before its maturity. In a reply thereto, dated October 12th, Stockton said, "We would prefer not to release the Leahy mortgage unless our action would be productive of real, substantial loss to her." In a letter dated October 14th, Adams again referred to the subject, as follows: "We will refer your answer to Mrs. Leahy." On November 20th, Adams again wrote:

"Have you the abstracts for the Leahy loan, corner Wood and Madison streets? If so, will you please forward the same immediately? Mrs. Leahy will probably sell the property. As to taking up the loans existing on the same, we have tried to arrange to let them lie, but we can not yet state. We have in hand two or three very good applications for loans which we will hold and have in readiness in case it should be necessary to take the money up, if you should desire to replace it here as well as to make the $12,000 Seeberger money coming in in December."

On November 22d, Stockton replied:

"We send Mrs. Leahy's abstract by express to-day, and hope that you can arrange that the loan shall remain without change."

On November 23d, Adams wrote:

"In view of uses to which the proposed purchaser proposes to make the Leahy property, corner of Wood and

Madison streets, Mrs. Leahy is obliged to request the clearance of the $10,000 loans upon the same. We both tried to arrange otherwise, but the sale—which she thinks she ought to make—depends upon this being done. Mrs. Leahy will pay interest to date of reinvestment, and I have assured her, in the light of your last favor on this subject, that I thought you would consent to release, though you did not like to do it. If you have not forwarded her abstracts, will you please do so.

Will you please advise me whether or not I shall arrange for reinvestment here.

On account of above, and the approaching Seeberger payment of $12,000, I enclose at once three applications which are worthy of consideration."

On November 26th, Adams wrote:

"I this date received abstract of title to property of E. A. Leahy, corner Wood and Madison streets, Chicago. I enclose receipt signed.

I expect to advise you definitely about the sale, etc., if it occurs, the latter part of this week, or early the coming week."

On November 28th, Stockton wrote:

"I telegraphed you yesterday from New York that all the money we wished to invest in Chicago was what would be received from the Leahy loan. We will also invest there the amount of Seeberger loan when we get it. We would prefer one or two mortgages, not more; and would like the land to be situated as nearly central as possible, *i. e.*, not suburban. With these considerations in view I think you will be able to recommend to us what applications in your letter of the 23d November, we had better take, or whether we had better wait for further applications.

We do not see our way clear to making the large loan you mention in your letter of the 25th. Your letter of the 26th enclosing receipt for abstract is also received."

On November 30th, Adams wrote:

"I have received your favor of the 28th of November and note your expression in regard to Seeberger and Leahy money. I will carefully personally examine the applications that have been made the first of the week and will then advise you how I think the money had better be divided up. All the loans presented are good, but which of all had better be taken I will reserve until my next letter.

Stockton v. Fortune.

At the same time I will give you date when Leahy money will be ready for your order and ask you at that time to forward note, trust deed, etc., in your possession."

If there was any specific authorization to Adams to accept payment of this loan and release the trust deeds before receiving the securities from appellants it must be found in the foregoing correspondence, for there is no other evidence tending to establish it. We examine the correspondence for the purpose of determining its effect as establishing the actual relationship between Adams and appellants and the authority actually given without any reference to what the effect might have been, had it been brought to the notice of appellee before he made payment to Adams. It does not appear from the evidence that any one of these letters was ever brought to the knowledge of appellee until after he had made the payment in question.

As between appellants and Adams it is apparent that an understanding was reached that appellants would consent to accept payment before maturity of the loans in question, but it is not apparent that such payment was to be made to Adams and without an exchange by appellants of securities for money. On the contrary, the last letter of Adams indicates that the money was, at some future time, when ready, to be subject to the order of appellants when they should send on the securities. Although the reinvestment of the money was discussed, it does not appear that any departure from the usual method was adopted, and the entire correspondence is consistent with the regular method of procedure as testified to by Hamilton, viz., that the money would be reinvested upon some loan by honoring the draft of Adams for the amount thereof when the draft should reach appellants accompanied by securities, opinion of title, etc.

From all the correspondence appellants had the right to presume that the indebtedness would not be paid until they should send on their securities to be exchanged for the money. There is nothing in the correspondence which, in our opinion, warrants a different conclusion.

It remains, then, to inquire if appellee was put in a position by any act of appellants, whereby he was entitled to

rely upon an authorization as existing, although it did not in fact exist.

The only evidence bearing upon this question consists of the testimony of William J. English, Esq., who acted as the attorney at law of appellee in the closing up of the transaction, in the course of which the payment by appellee Fortune to Adams was made. Mr. English testified, among other things relating to the transaction, as follows:

" Q. After examining the letter of September 28, 1888, which has been offered in evidence, do you conclude that that is the letter shown you by Mr. Adams on the occasion to which you have testified, when he presented the release for your acknowledgment? A. I think that was one of the letters, yes.

Q. Have you been able to ascertain what other letters were offered or shown to you at that time? A. No, I have not, positively.

Q. And are you unable to identify any other letters as having been shown you? A. Yes, I can say that positively. I have an impression that one or two of the letters which appear in this batch was shown to me, but I would not say positively.

Q. But you are not able to identify them? A. No, sir."

The letter of September 28, 1888, written by Stockton to Adams, is as follows:

" Your letter of the 26th at hand, and contents noted. Mrs. Leahy's property is appraised at—land alone $18,000, building $10,000. There does not seem to be any objection on account of value to increasing the loan to $8,000 or $10,000. Part of the Proudfoot money might be used for this purpose if it were not for the difference in the rate of interest. If Mrs. Leahy will pay seven per cent, you have our assent to making this arrangement; or if Mr. Proudfoot will pay Mrs. Leahy the difference. If you can not arrange this matter, let me know, and we will see if something else can be done."

This letter indicates, if anything, that the specific assent of appellants was required in each particular instance, to any change of investment made by Adams. No other one letter in the series of correspondence is shown to have been brought to the knowledge of English, so that there can

arise no question as to any false impression given to English, and through him to appellee, by the letters of appellants.

The further testimony of Mr. English shows very clearly that it was not the letters of appellants, but the false statements of Adams, upon which English and appellee Fortune placed their reliance.

" I asked for the notes which were secured by the trust deeds which these release deeds released; that is what I mean to say, and he stated to me that he had been very much pressed with business in anticipation of his going away to Boston, and that he had made a search in his office for them; that he had supposed surely that they were in his office, but had not been able to lay his hands on them; that they were mislaid; that he had looked for them before—several days before, and not finding them, in order to be sure about it, he had written to Messrs. Stockton and Anderson that if they had them to send them on, because, as he had informed them, that Mr. Fortune had required the obtaining of the property clear of all mortgage, and that he had received a letter from Mr. Anderson stating that Mr. Stockton was not there at present, but was expected on the very day that he wrote, and that he himself didn't know where they were, and if they were there that he would have Mr. Stockton send them on just as soon as he returned that day. Mr. Adams said that if they had them they would be on that afternoon mail, or at the latest, he supposed, in the morning, and that he would send them over, or have his partner, Mr. Hamilton, do so, as he himself had purchased his ticket and sleeper for the evening train for Boston with his wife, and that his wife was outside the door in a cab at the time, waiting for him to complete this matter, and he stated that he was pretty sure they were in his office, but were simply mislaid, and that his dealings, as he had told me before, with Stockton and Anderson were—that is, they were jointly interested in the investments and so forth, and they really owed him quite a large amount of money, and the notes were sometimes left in his office and sometimes in theirs, and just where that one was at that time, he was not perfectly sure, but he was really the owner of the amount at the time, because he had advanced them so much, and he said that was unfortunately the way it was, and Mr. Fortune asked me what I thought about it from what he said, and I said I knew Mr. Adams as a reputable lawyer

and apparently well off, and standing high socially, and if I was dealing with him on my own matter I should certainly suppose that what he stated was true, but, of course, it was a matter of business purely, but that I should myself take my chances on it; and Mr. Fortune then made out a check and gave it to him, and the transaction was completed."

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. You said in your testimony that he stated on that occasion that he had received a letter from Mr. Anderson? A. Yes, sir.

Q. Stating that Mr. Stockton was away—did he produce that letter on that occasion? A. I don't think he did; no, sir.

Q. Did you inquire for it? A. No; I don't know whether I inquired for it or not.

Q. You did not call for any writing there from Mr. Adams on that occasion, did you? A. I don't think I did. I had not the slightest question of doubt in regard to his word at that time about it.

Q. And you accepted his statement as truthful? A. I believed his statement at that time; just as I would believe your statement under similar circumstances.

Q. It was your understanding at that time that previous to the payment by Mr. Fortune of the consideration for that property, that the trust deeds and notes which you have were still outstanding, subsisting incumbrances? A. I don't know that I could state that exactly, because he talked in a way as though it was his own anyway, and it didn't make any difference. I gained the impression that he had advanced money for Stockton and Anderson in his deal with them, by which he was really and virtually the owner of those incumbrances."

It seems very apparent that Mr. English and his client, appellee, paid the money to Adams in reliance upon the statement of Adams that he was in fact the owner of the securities to be released, and not in reliance upon any appearance of authority conferred by appellants as owners and principals upon Adams as a mere agent. The statement of Adams, upon which appellee thus relied, viz., that Adams was in part or in whole the real owner of the securities, was absolutely false. Nor is there anything contained in any of the correspondence which would in any degree give color of truth to the falsehood.

In passing upon the right of appellee to rely upon any appearances of authority, if any such had been brought to his knowledge, it is important to consider the fact that these notes, not yet matured by their terms, were not in the possession of the agent who undertook to accept payment of them.

Many of the early authorities announce, in effect, that in the payment before maturity of debts secured or evidenced by writings, the possession of the securities by the alleged agent is indispensable evidence of authority to receive payment, in order to enable the debtor to rely upon appearances of authority, or in the absence of an actual authority established. Dunlap's Paley on Agency, 274; Jones on Mortgages, 964; Wolstenholm v. Davies, Freeman's Ch. R., 289; Roberts v. Matthews, 1 Vernon, 150; Baldwin v. Billingsley, 2 Id. 539; Curtis v. Dought, 1 Molloy, 487; Henn v. Conisby, 1 Ch. Cases, 93; Gerard v. Baker, Id. 94, note; Williams v. Walker, 2 Sandf. Ch. 325; Smith v. Kidd, 68 N. Y. 130; Frank v. Tuozzo, 50 N. Y. Supp. 71; Wheeler v. Guild, 20 Pick. 545; Cox v. Cutter, 28 N. J. Eq. 13.

Without going to the extent of holding that under all circumstances the possession of the securities by the ostensible agent would be absolutely indispensable, in order to protect the debtor, who had relied upon appearances of agency, and sought thereby to estop the alleged principal from denying the agency, it is sufficient for the purposes of this case to say that in the absence of anything save the letter of September 28, 1888, done by appellants and relied upon by appellee, which could operate to estop appellants from denying the agency of Adams, we hold that the fact that the notes were in the hands of appellants, and not in the possesion of Adams, is controlling. Cooley v. Willard, 34 Ill. 68; Garrells v. Morton, 26 Ill. App. 433; Viskocil v. Doktor, 27 Ill. App. 232.

Finding as we do from the evidence, that Adams had no power within the scope of any general agency to thus accept payment, and that he received no specific authorization so to do, we are also led to the conclusion that there is

no fact established in the evidence, relied upon by appellee in making payment, which operates to estop appellants from setting up the truth as to the authority of Adams.

Many authorities are cited by appellee's counsel which would bear upon the case if the evidence was sufficient to establish a general agency of Adams to receive payment upon all loans made by appellants through his office.

In Thornton v. Lawther, 169 Ill. 228, the evidence established a general agency, under which the agent was invested with powers of the broadest scope in managing and disposing of the funds of the principal, without specific direction or authority in each particular investment. The facts in that case warranted the conclusion that the agent was clothed with authority to do anything which the principal might have done in the matter of investment, accepting payment, reinvestment, etc. The actual authority of the agent was established. So also in Noble v. Nugent, 89 Ill. 522, the court held that an actual authority to receive payment was established, saying: "The circumstances that the notes were not surrendered, as against clear proof that they were paid to a person having authority to receive payment, amounts to nothing."

And in Security Co. v. Richardson, 33 Fed. Rep. 16, the court evidently reached the conclusion that the agent was actually authorized to receive the payment there in question. The court said: "That Bolles recognized and treated Creighton as his general agent, having charge over the investments made, with power to demand and receive payment of the principal and interest thereof, is the only reasonable conclusion deducible from the correspondence and the acts of the parties."

But in the case under consideration no such actual authority is established. Nor is it contended by counsel that there was any power in Adams under any such general agency as obtained in the Lawther case and others cited. In the opinion of the trial court, which is made part of the several briefs of counsel, it is clearly indicated that the court found that no such authority existed, unless spe-

cifically conferred for this particular transaction. Therefore the cases above considered do not apply and can not control.

We are of the opinion that the conclusions of the master in chancery before whom this cause was heard, were correct.

The decree is reversed and the cause is remanded, with directions to enter a decree in conformity with the report and recommendation of the master in chancery. Reversed and remanded with directions.