Strey v. Pliemleng et al., 220 Ill. App. 249.

## Clara E. Strey, Appellant, v. Mary L. Pliemleng and Nicholas J. Pliemleng, Appellees.

## Gen. No. 25,502.

1. MORTGAGES, § 175*—*when assignee is bound by agreement of original parties.* Where a mortgagor borrowed money of a building and loan association, with the agreement that he be allowed to make payments on the principal before maturity, and subsequently the note was extended, and the mortgagor made payments on the principal and subsequently the note and mortgage was assigned, the assignee took it subject to the qualification mentioned.

2. MORTGAGES, § 405*—*when foreclosure by assignee is precluded.* Where certain persons had borrowed money of a building and loan association and had made payments thereon, and, when their note was about to mature, executed an extension loan agreement, wherein the name of a third person appeared as owner of the note, and on inquiry it was stated to the borrowers that such name was used because the association under its charter could not make a straight loan, and subsequently in a suit to foreclose the mortgage by the owner it appeared that such owner had purchased the note and trust deed in an irregular manner by paying part cash and giving a subscription to the stock of the association, and that the mortgagors had paid a portion of the debt to the loan association, the assignee of the mortgage could not contend that she took the trust deed free from the equities of the mortgagors as to the money paid on the debt, and the court would weigh the equities and dismiss the bill to foreclose, the equities of the defendant being superior to those of the plaintiff.

3. MORTGAGES, § 11*—*when mortgagor exercises due care.* Where an extension agreement on a note given to a building and loan association recited the name of complainant as the owner of the note, and the maker inquired about change in names, and was told by the agent of the association that the change in names was a mere matter of form and that the association could not make a straight loan under its charter, such explanation was sufficient, and the conduct of the maker showed more than ordinary care in investigating the nature of the extension agreement.

4. WITNESSES, § 144*—*when testimony is not incompetent.* Section 4, ch. 51, Hurd's Rev. St. (J. & A. ¶ 5521), providing that in an action, suit or proceeding a party to the same who has contracted with a deceased agent of the adverse party "shall not be

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

a competent witness as to any admission or conversation between himself and such agent," is not applicable to the admission or conversation of a deceased agent of a building and loan association in a suit between third parties arising out of a transaction with the association, in which the deceased acted only as agent for the association.

THOMSON, J., dissenting.

Appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1919. Affirmed. Opinion filed December 22, 1920.

**Statement by the Court.** This is an appeal by the complainant, Clara E. Strey, from a decree entered in the circuit court of Cook county, dismissing her bill of complaint, for the foreclosure of a trust deed, for want of equity.

On July 16, 1918, the complainant filed a bill of complaint to foreclose a trust deed executed on March 25, 1911, by the defendants, Mary L. Pliemleng and Nicholas J. Pliemleng, her husband, conveying certain real estate to the Chicago Title & Trust Company as trustee to secure the payment of their promissory note of the same date in the sum of $800, payable 5 years after date to the order of themselves and by them indorsed and delivered to the People's Building & Loan Association. It was alleged in the bill of complaint that the promissory note for $800 was extended on April 1, 1916, by an agreement between the complainant and the defendants, so as to become due and payable on April 1, 1919. The bill of complaint alleged that the defendants had defaulted in the payment of a certain instalment of interest which it was claimed was due, under the extension agreement, on April 1, 1918.

Mary L. Pliemleng and Nicholas J. Pliemleng, defendants, filed an answer admitting the execution on March 25, 1911, of the principal note but claimed that they delivered that note to the People's Building &

Loan Association, from which they borrowed the $800, and that $300 of the said $800 was paid back to the association before the maturity of the note; that the payment of part of the principal was made in accordance with an agreement entered into at the time the $800 was borrowed. By their answer they also admitted that on April 1, 1916, they executed a writing extending the time for the payment of the note for 3 years from April 1, 1916, but denied that the complainant was at the time of the making of that extension agreement the owner of that note, and alleged that the complainant's name was used only as a matter of form and convenience by the People's Building & Loan Association; that they were so informed by the People's Building & Loan Association at the time they entered into the extension agreement. That they were never notified that the $800 note was ever assigned by the People's Building & Loan Association to the complainant. By their answer they denied that default had been made in the payment of interest coupon note number 4, due and payable April 1, 1918, and denied that the complainant had any right to declare the entire indebtedness due and payable.

On October 2, 1918, the cause was referred to a master in chancery. Subsequently, on March 21, 1919, the master filed his report, together with the evidence, finding inter alia, that the complainant having failed to give notice to the Pliemlengs that she was the legal owner and holder of the "loan papers" was bound by the payments made by the Pliemlengs and that as a result the defendants were not in default at the time the bill of complaint was filed. On April 9, 1919, the chancellor overruled the exceptions of the complainant to the master's report and entered a decree dismissing the plaintiff's bill of complaint for want of equity.

The evidence taken before the master, which is all the evidence in the case, shows substantially the following:

In the year 1898 or 1899 the Pliemlengs (husband

and wife), the defendants, first began dealing with the People's Building & Loan Association, borrowing from it $1,250, with which to buy the property that subsequently became their home. The title to that property was taken in the name of Mary L. Pliemleng, the wife. Some time subsequently, although the evidence does not show the exact date, the Pliemlengs had another transaction with the association and became indebted upon a note due to the association. Upon that note, before its maturity, they from time to time, pursuant to agreement, made payments on the principal to the association. Finally, on March 25, 1911, the Pliemlengs executed and delivered to the association a note for $800—being the note here in question—payable in 5 years, to the order of themselves and indorsed by them; and, on the same date, to secure that note, they executed a trust deed of the real estate described in the bill of complaint. It is that trust deed which it is here sought to foreclose. That transaction occurred in the office of the People's Building & Loan Association in the Borden Block, Chicago, and was conducted on the part of the association by Harrison Kelly, secretary and treasurer of the association. At the time the note for $800 and the trust deed to secure it, both being dated March 25, 1911, were executed and delivered to the association, the Pliemlengs had reduced their whole indebtedness to the association to the sum of $500, and as the Pliemlengs desired to increase the loan to $800, it was then arranged by the association, through Kelly, as its secretary and treasurer, that they should be paid the additional $300 so as to make their total indebtedness to the association equal the face amount of the new note. It was also agreed between the Pliemlengs and the association that they could do what they had been doing previously, as to their former loan, pay part of the principal, from time to time, before maturity. N. J. Pliemleng testified that Kelly said: "Yes you can do just the same as you have been doing,

$100 at a time.'' Thereafter, and before the note of March 25, 1911, was due, the Pliemlengs paid, according to the testimony of N. J. Pliemleng, $300 on the principal of that note. Two receipts offered in evidence show that $100 was paid on July 7, 1913, and $100 on August 18, 1913. On the back of each receipt is a writing to the effect that the Pliemlengs received back the amount of the receipt. One of those memoranda contains two dates, May 22, 1913, and April 4, 1914, and the other is dated May 19, 1915.

About the time when the note of March 25, 1911, was to mature, N. J. Pliemleng applied to the association for an extension of that note and, according to his testimony, requested that he be given back $300, making his total indebtedness $800, that is, equal to the face of the note which he desired to extend.

The evidence of Miss Burgoyne, who was assistant to Kelly and who had worked for the association a great many years and had known the Pliemlengs as customers of the association for practically the same length of time, is to the effect that N. J. Pliemleng came into the office of the association and asked for an additional loan, and that Kelly, the secretary and treasurer, was not able to tell him offhand whether the association could make it or not; that Pliemleng came in several times to find out if he could get the loan; that Kelly told Pliemleng that if the association had money enough to make it and if the board of directors acted favorably upon it that it would be allowed. Subsequently, Pliemleng was notified by Kelly to bring in his wife and sign the papers and they would let him have the other $300. About April 1, 1916, the Pliemlengs went to the office of the association to consummate the transaction. There were present at that time in the office of the association, Kelly, the secretary and treasurer, Miss Burgoyne, his assistant, and the two Pliemlengs. There was then presented to the Pliemlengs, to be signed, a printed form entitled,

"Agreement for extension of loan," with the blank spaces typewritten in, purporting to extend the payment of the $800 note for 3 years from April 1, 1916, to April 1, 1919; and, also, six interest notes of $24 each, evidencing the interest which would accrue on the note, as extended. The agreement for the extension of the loan recites in part as follows:

"Memorandum of agreement made and entered into this first day of April, 1916, between Clara E. Strey * * * party of the first part, and Mary L. Pliemleng and Nicholas J. Pliemleng her husband * * * party of the second part; Witnesseth, Whereas, said party of the first part is the legal owner and holder of the said promissory note made by Mary L. Pliemleng and Nicholas J. Pliemleng, dated March 25, 1911, in the sum of $800 payable five years after said date, * * * Now, therefore, said party of the first part agrees to extend the time of payment of $800 of said note" from April 1, 1916, to April 1, 1919, etc.

It is the evidence of Pliemleng that he looked over the renewal papers and saw instead of the name of the association the name of one Clara E. Strey, and upon asking Kelly about it Kelly said that she was a friend of his and it was simply a matter of form and the association under its charter could not make a straight loan; that it would lose its charter and that he, Pliemleng, would have nothing to do with it in any way; that he was dealing with him and the association.

It is also the testimony of Mrs. Pliemleng that at the time of the execution of the extension agreement she heard her husband ask about the name and that Kelly said it did not matter to him, that it was only a matter of form; that the association could not make a straight loan; that that was a friend of his and that it did not matter about the name. Accordingly, the extension agreement and the six extension coupon notes were at that time signed by Mary Lee Pliemleng and her husband, Nicholas J. Pliemleng. N. J. Pliemleng further testified that he asked Kelly if he could

pay up in the manner he had been doing for a number of years and that Kelly said any time he had $100 he could bring it in. It is also the evidence of Miss Burgoyne, Kelly's assistant, that Pliemleng asked for the privilege of paying any amount, $50 or $100, and that Kelly said he could do so.

On the day the extension agreement was signed at the office of the association, Pliemleng was there given $100, and a few days later the remaining $200, making the total indebtedness of the Pliemlengs to the association $800, the amount of the face of the note. On October 5, 1916, Pliemleng paid the first interest coupon on the $800 note of March 25, 1911, as extended. On May 5, 1917, Pliemleng went into the office of the association and told Kelly that he had $100 to pay on the principal. Kelly took it and said, all right, and gave him a receipt. That receipt recites that Harrison Kelly received of N. J. Pliemleng on May 5, 1917, $100.60 "on a/c of Mtg. on premises 46th Place reducing the same to $700." On June 16, 1917, Pliemleng made another payment on account of the principal and received a receipt, similar in general to the one just described, for $101.25; and on September 24, 1917, he paid another $100 on account of the principal and received a receipt therefor. He also paid on October 1, 1917, $17.50 for interest due October 1, 1917. On the latter occasion Kelly gave him a receipt and told him that he had mislaid the coupon; that, however, was sent to him in the course of a few days.

It is the evidence of Miss Burgoyne that the petty cash book of the association showed, under date of May 5, 1917, "$100.70 paid in May 5, 1917, by Mr. Pliemleng"; on June 16, 1917, "Pliemleng account of Strey $101.25"; on September 24, 1917, a credit to "Clara Pliemleng for $100.00"; that all three of the entries were in the handwriting of Kelly; that those items were also shown at page 3,985 in one of the ledgers under the name of Clara E. Strey; that the money

represented by those items was put in the bank to the account of the People's Building & Loan Association; that those items constituted a record of the payments made by the Pliemlengs to the association on account of the indebtedness represented by the extended $800 note.

Miss Burgoyne further testified that it is recited at page 3,985 in one of the ledgers of the association under the name of Clara E. Strey that her stock was "matured." The evidence of Miss Burgoyne also shows that both the Pliemlengs and Mrs. Strey held at times stock in the association.

The regular method of the association was to loan moneys to those who became members and who paid certain monthly instalments into the treasury of the association. In case a loan was made the certificate of the member, showing the number of shares, would be held by the association as collateral to the loan. Each member was supposed to have a pass book in which whatever payments were made to the association were entered.

Miss Burgoyne testified that the association did not make loans where it did not have certificates as collateral; that she did not know of any loans where there was no stock collateral. It was the habit of Kelly, the secretary and treasurer, according to further testimony of Miss Burgoyne who was his assistant for 20 years, that if a member, who had stock in the association which had matured, desired to invest that amount, to write him up a loan, the amount of which would be borrowed by some other member who subscribed for stock; and when the stock of the latter was paid out as a result of the payment of monthly instalments or matured, he would then turn over that amount to the holder of the mortgage.

It is evidence of the complainant, Clara Strey, that she came into possession of the note and trust deed in October, 1911, that is over 6 months after the

Pliemlengs had given the note to the association with the agreement that they could pay any part of the principal before maturity; that she received it from the People's Building & Loan Association; that at the time she was working for one Demsey in the same suite of offices as that occupied by the association, doing bookkeeping and stenography; that she gave Kelly "a check for $514.25, some cash and took out some shares in the Building & Loan Association for the balance, as I didn't have enough cash money and I kept these shares long enough to pay the balance"; that she believes that she made payments of $5 a month on account of the stock and retained membership in the Building & Loan Association "long enough to pay the balance to make $800. I know it was not after 1912"; that she did not get the first coupon of the $800 note as it had run 6 months before she bought it; that when the coupon notes became due she went to the association office and Kelly gave her either cash or a check for $24 in place of the coupon; that at the time the principal note matured, Kelly wrote and told her that the Pliemlengs wished to renew the mortgage from 3 to 5 years; that she called Kelly up and said she would extend it for 3 years and that he said to send the trust deed to him, which she did; that subsequently he sent back the trust deed, the extension agreement and the coupons; that three of the coupons, each for $24, were subsequently paid; that she took them down personally to the association office and received $24 for each one.

She further testified that she was in the same office as the association for 2 or 3 years, leaving that office in May, 1913, and that while there she sometimes took in money that was paid into the association in the absence of the office force.

On the 14th day of October, 1917, between the maturity of the extension interest coupon No. 3, which was settled by the Pliemlengs with Kelly on October

1, 1917, and April 1, 1918, when the interest coupon note No. 4 became due, Harrison Kelly committed suicide.

There was put in evidence the testimony of a number of witnesses in regard to different statements made by the Pliemlengs and by Mrs. Strey in certain conversations which they had together on the subject of the $800 note, shortly after the death of Kelly. Mrs. Strey testified that she went to the Pliemleng's house shortly after Kelly died and after she learned that he was an embezzler, that she told Mrs. Pliemleng that she held a mortgage on their property for $800; that Mrs. Pliemleng said that they had paid $300 and the mortgage was only $500; that she told Mrs. Pliemleng she had never received a cent of it. She also testified that Mr. Pliemleng upon another occasion said that he did not know that Kelly or the Building & Loan Association did not hold the papers; that Kelly told him that the lady in the office, Miss Burgoyne, would take as low as $25 of the principal at a time.

One Mrs. Johnson testified that she heard Pliemleng say in October, 1917, in the presence of Mrs. Strey, that the association did not hold the mortgage as it was against the rules for them to hold anything like that; that they would lose their charter; that he said he thought the young lady in the office named Carrie held it and that she was always present when he made the payments. On the other hand, Mary Bryson, the daughter of the Pliemlengs, testified that she was present when Mrs. Strey called after the death of Kelly and that when her mother told Mrs. Strey that they had paid $300 of the $800 Mrs. Strey said, "Well, I suppose I am very fortunate that I didn't lose the whole amount of the $800."

One J. S. Johnson testified that about the last of October or the 1st of November, 1917, at a conversation between Clara E. Strey and the Pliemlengs, the Pliemlengs acknowledged that they knew that neither

the Building & Loan Association nor Kelly held the
note because Kelly told them that the association
would not be allowed to handle a mortgage of that kind
and it would lose its charter; that Kelly told them that
the lady in the office held the note and that she knew
when they were there and paid principal and interest.
Also, one Julia Marie Johnson testified that she went
with Mrs. Strey to the Pliemlengs' home in 1917, and
that that conversation took place about as stated by
the witness J. S. Johnson.

The evidence further shows that when the extension
interest note No. 4 became due on April 1, 1918, the
complainant made a demand for its payment; that it
was refused by the defendants, but a tender made by
them of $15, interest on what they claimed was the
unpaid balance of the principal indebtedness, that is,
$500; that the tender was refused and on July 16,
1918, the bill of complaint filed to foreclose the trust
deed given to secure the $800 note.

HENRY J. and CHARLES AARON and FRANKLIN RABER,
for appellant.

GEORGE E. WISSLER, for appellees.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion
of the court.

Inasmuch as the defendants, the Pliemlengs, refused
to pay interest on the full amount of $800, the original
amount of the note as extended, on the ground that
they had paid their creditor, the association, $300 of
that principal and were only willing to pay interest
on the sum of $500, the complainant filed her bill of
complaint seeking to foreclose the trust deed given
to secure that note, alleging that the defendants were
in default.

The evidence shows that the Pliemlengs had all their
dealings with the Building & Loan Association; that

they neither borrowed from nor paid money personally to Kelly; that their dealings with him were always in his official capacity, and also shows that throughout a long period of time they had been allowed by the association to pay amounts of principal before the maturity of the particular note upon which the payments were made; that they had done that prior to March 25, 1911, on the note which preceded the one here in question; and that, when on March 25, 1911, the note herein involved was executed and delivered to the association as the association's property and before the complainant claims she got it from the association, it was agreed between the Pliemlengs and the association that in the future they would be allowed to make payments on the principal before its maturity. Likewise, at the time of its extension, the evidence shows that that agreement was recognized and confirmed by the association, through its Secretary and Treasurer Kelly, that they could pay from time to time parts of the principal of the note before it matured. The complainant does not criticize the conduct of the Pliemlengs in paying parts of the principal and being credited therefor by the association on the $800 note between March, 1911, and the time of its extension, 5 years thereafter. The fact is, the evidence shows that at the time that arrangement was originally made between the Pliemleng's and the association in March, 1911, the complainant did not claim to have any interest in the note; she did not become interested in the note until 6 months thereafter, and so must be considered as taking it subject to that qualification. The agreement that the Pliemlengs could pay principal before maturity was part of the note when it was made, March 25, 1911, before the complainant claims any interest in it, and that agreement is still part of it, as extended.

As to the right to make the payments of $100 each, on the $800 note, after it was extended, which were

made in May, June and September, 1917, they were undoubtedly made and received by the association pursuant to the agreement made on March 25, 1911, and emphasized at the time of the extension.

Further, the evidence shows that those three payments on the principal of the note were set forth in the petty cash book and on the ledger of the association and that the association charged them against itself, and credited them to the complainant on her account.

Then, too, it is the evidence of the complainant that when she undertook, as she claims, to purchase from the association the $800 note in question back in 1911, she gave a check for $514.25, some cash, and suscribed for some shares of stock in the association, all of which shows that she was a member of the association and was dealing with it and was in no way, legally at least, purchasing the note from the defendants. As a matter of law the association, according to its charter limitations, could not transfer and sell to her the $800 note.

The Pliemlengs had borrowed money from time to time from the association and according to the testimony of Miss Burgoyne had subscribed for stock; and everything that they had done in the course of their dealings with the association was legal. No complaint can be made by the association because they were allowed to pay parts of the principal of their indebtedness before the note matured. And, when the note for $800 of March 25, 1911, was about to mature and the Pliemlengs desired that it be extended and they were told that the association had the money and the directors sanctioned it; that they could get the $300 and have the note as an $800 note extended, that was all regular, and also in accordance with their former dealings. And when, then, the Pliemlengs went to the offices of the association to sign the papers at the request of Kelly, the secretary and treasurer, and they were presented with the extension coupon

interest notes and the extension agreement which recited the name of the complainant as the owner and holder of the note of March 25, 1911, which the complainant could not legally purchase, as against the defendants, it was only natural that N. J. Pliemleng should ask, as the evidence shows he did, about the name of Clara E. Strey; and when in answer thereto, as testified to by both the Pliemlengs, Kelly said that she was a friend of his and that it was simply a matter of form; that the association under its charter could not make a straight loan; that it would lose its charter; that it did not matter about the name; that explanation was sufficient, and the conduct of N. J. Pliemleng showed more than ordinary care in investigating the nature of the extension agreement.

So, even if the transaction be looked upon as an illegal effort on the part of the association to make a straight loan, as Kelly called it, it is also true that the complainant at the time she bought the note, as she claims she did, must be considered as having known that, under the law, the association could not sell to her that note. There is no doubt but that the transaction she had with the association, as she described it herself, was irregular, as the law does not permit a building and loan association to sell such a note for part cash and part to be paid for by a subscription to the stock of the association. There is no doubt but that the Pliemlengs as against the association are entitled to credit for the payment of the $300, and likewise there is no doubt but that the complainant as against the association is entitled to recover $300. It may be said that the complainant and the defendants are all innocent of any wrongdoing, but, in our judgment, in view of the evidence, especially having in mind that, at the inception of the note of March 25, 1911, and as part of what it connotes, it was agreed that the Pliemlengs might at any time pay any part of the principal indebtedness, which right on the

part of the Pliemlengs the extension agreement of April 1, 1916, in no way affected or purported to change, and, bearing in mind the fact that whatever title the complainant has, she obtained through irregular methods on the part of the association, which she must be assumed to have known were not sanctioned by the strict letter of the law, it cannot be reasonably contended that the complainant, as against the Pliemlengs, legally obtained title to the $800 free from all equities in the Pliemlengs as to the $300 which they had paid the association. The principle of *Olds v. Cummings*, 31 Ill. 188, which is the law in this State, requires us to consider and weigh the equities. Having done so, we are of the opinion that in equity the position of the defendants is superior to that of the complainant and that, therefore, the bill of complaint was rightly dismissed.

It is contended by counsel for the plaintiff that certain testimony of the defendants in regard to conversations with Kelly, who at the time of the trial was dead, was incompetent. Section 4, ch. 51, Hurd's Rev. St. (J. & A. ¶ 5521), provides that, "in every action, suit or proceeding a party to the same who has contracted with an agent of the adverse party—the agent having since died—shall not be a competent witness as to any admission or conversation between himself and such agent," unless, etc.

In *Grand Lodge A. O. U. W. v. Young*, 123 Ill. App. 628, which was a claim by a widow on a benefit certificate against a fraternal organization, it was held, the question being as to the payment of certain assessments, that the widow, the beneficiary, was not entitled to testify to conversations with one Bundy on the ground that "Bundy, as the financier of the local lodge, was in his lifetime the agent of appellant," etc. And in *Rothstein v. Siegel, Cooper & Co.*, 102 Ill. App. 600, where an employee brought suit against his employer, Siegel, Cooper & Company, for certain commissions

and compensation for services, the court held that a conversation between him and one Brennan, the former treasurer of. Siegel, Cooper & Company, was incompetent under section 4, *supra*. The facts in those cases are quite dissimilar from those in the instant case; here, the complainant and the defendants are, as it were, suing each other as third persons, and the only claim that could reasonably be·made is that each had dealings with the association, the Pliemlengs claiming to havè paid certain money to the association upon a certain indebtednèss and the complainant claiming to own a certain note, exclusive of any payments of principal thereon, which she bought from the association. This suit is not to foreclose property of the association. If it were, the evidence might be incompetent as to the association, as the association could claim ·that Kelly was its agent. But, as said before, this is a suit between third persons whose dealings were with the association. · It may well be that the association acted as an agent, but the claim of counsel for the complainant is not made on that ground. The claim is that Kelly personally was an agent and of that there is insufficient evidence. All he did, as far as the evidence shows, was done and accomplished for the association. We are of the opinion that the evidence objected to was competent.

Further, when the testimony in question was taken and objections by counsel for the complainant were made, the master directed that it be admitted subject to objection and at no time thereafter by objection, exceptions or otherwise, was the matter called to the attention of the master or chancellor.

Finding no error in the record the decree is affirmed.

*Affirmed.*

O'CONNOR, J., concurs,
THOMSON, J., dissenting.

MR. JUSTICE THOMSON dissenting: I do not concur

Strey v. Pliemleng et al., 220 Ill. App. 249.

in the foregoing opinion. For some years the defendants had been doing business with the People's Building & Loan Association, through one Kelly, its principal officer and manager, when, in March, 1911, they executed their note for $800, due in 5 years, payable to the order of themselves, and to secure payment thereof they executed a trust deed on certain property to the Chicago Title & Trust Company, as trustee. They delivered these papers to Kelly to take up a prior loan and cover an additional sum of money they were borrowing from the Building & Loan Association. In October, 1911, the complainant purchased this loan from the association through Kelly, for its face value, paying cash in part and taking stock in the association, sufficient to cover the balance. After complainant became the owner of this mortgage paper she pursued a line of conduct which constituted Kelly her agent for the collection of the interest, for as the interest fell due she took the coupons to Kelly and received the cash for them and the defendants came into the office of the association and paid their interest and received their canceled coupons. By the terms of the trust deed, the principal and interest were payable at the office of the association. Complainant did not notify the defendants that she had acquired their note and they did not become aware of that fact before the note matured, April 1, 1916. During the period of this loan the defendants, through an arrangement they had effected with Kelly, had made three payments of $100 each on the principal. These amounts had not been turned over to the complainant and she had no knowledge that they had been paid. The note made no provision for payment, either in whole or in part, before maturity. When the note matured in April, 1916, the defendants told Kelly they would like to have it extended for a term of 3 years and also that they needed the $300 they had paid in and therefore wanted the note extended for its original amount, $800. Kelly

notified complainant that the defendants wanted the note extended for 3 years and she agreed to such extension and at Kelly's request she sent the trust deed to him so that an extension agreement could be prepared. Kelly prepared the extension agreement and the defendants, at his request, came into the office of the association to execute it. . The testimony of the defendants themselves shows that at this time they noticed the name of complainant in the extension agreement and asked Kelly about it and he told them, in substance, that the association could not make them a direct loan such as this was and that, therefore, he had used complainant as a party to the loan; that she was a friend of his and that it would make no difference so far as the defendants were concerned; that as to them the loan would continue to be just as though it was made with the association. Thereupon the defendants executed the renewal agreement and Kelly paid them $100, and $200 a few days later, so as to bring the loan up to its original amount. Although the defendants had paid these amounts toward the principal during the 5-year period ending April 1, 1916, when the note matured, and after making such payments had made interest payments to Kelly, accordingly, the complainant had always received the full interest from Kelly based on the full amount of the loan. As the instalments of the interest came due under the extension of the loan they were paid to Kelly by the defendants, and by Kelly turned over to the complainant, just as they had been previously. After the extension of the loan, the defendants, by virtue of an arrangement they consummated with Kelly, again made payments toward the principal,—three in number, of $100 each. These payments were not turned over to the complainant and she had no knowledge of them. As previously, defendants made correspondingly smaller interest payments to Kelly, after making their payments to apply on the principal, but

Kelly made the interest payments for the full amount due as interest (based on the full amount of the principal note) to the complainant whenever she presented the interest coupons as they fell due. Shortly after the payment of the third interest coupon, under the extension agreement, in October, 1917, Kelly committed suicide and it was then discovered he was an embezzler. The complainant then called on defendants, with regard to her investment and they then told her of the payments they had made on the principal since the loan had been extended and they produced Kelly's receipts therefor. As was the case with the original note, the extension agreement made no provision for payment of the loan, either in whole or in part, before its maturity on April 1, 1919. The defendants refusing to pay more than the proportionate amount of the interest which they claimed they owed, when the fourth interest coupon came due, the complainant claimed a default and elected to declare the entire indebtedness due and filed her bill to foreclose.

The complainant contends that the evidence introduced before the master fails to establish the facts alleged by the defendants to the effect that they had made payments to Kelly, since the extension of the loan, to the extent of $300. The evidence on this point is, to say the least, confusing, but it seems sufficient to warrant the finding that the payments had, in fact, been made.

The majority opinion asserts that, under the law, the Building & Loan Association could not sell complainant the Pliemleng note. But if the complainant's dealings with the association, through Kelly, were irregular, those of the Pliemlengs, so far as they had to do with the loan here involved, were still more so, for the association had no power, under the law, to make the Pliemlengs a straight loan as this was. So far as irregular dealing with the association is concerned, both parties to this suit had indulged in that.

Moreover, the evidence fails to show that the complainant had any knowledge of the illegality of the transactions involved, but on the other hand, it shows that the Pliemlengs were told, by Kelly himself, that their $800 loan was illegal, as the association had no power to make such a loan but that he was getting around that by using the complainant, who was "a friend of his," and representing her as the owner of the loan. In weighing the equities between the parties to this suit, it would seem that they favored the complainant rather than the defendants.

There is much evidence in the record as to the conversations which the defendants had with Kelly about this loan. Although complainant may have waived the error in admitting that testimony, by reason of her failure to make it the subject of an objection to the master's report, before the master, and an exception before the chancellor, I do not agree with the statement made in the majority opinion to the effect that such testimony was competent. In my opinion, it was clearly incompetent under the provisions of section 4, ch. 51, of our statutes (J. & A. ¶ 5521), as Kelly was clearly acting as complainant's agent, and it was admitted that at the time of the hearing of this case he was dead. The dealings of the defendants cannot be considered as having been had with the association, after the maturity of the loan on April 1, 1916, but all their dealings, from the execution of the renewal agreement on, were with Kelly, whom complainant made her agent for the consummation of the renewal agreement and the collection of her interest.

In my opinion, the doctrine laid down by our Supreme Court in *Olds v. Cummings,* 31 Ill. 188, and followed in a long line of subsequent decisions, to the effect that in a suit in equity to foreclose a mortgage the rights of an assignee of a mortgage will be subject to all equities existing between the original mortgagee and the mortgagor where the latter has had no

notice of the assignment, has no application to the facts involved in the case at bar. The extension agreement, which was executed by the defendants and which afterwards was duly acted upon by the parties, recited upon its face that it was an agreement "between Clara E. Strey of Cook County, Illinois, party of the first part" and the defendants as parties of the second part and it recited that "the first party is the legal owner and holder of a certain promissory note," and then proceeded to describe the note of the defendants in question. When the defendants executed that instrument they were put on notice that this complainant was the legal owner and holder of that note and indeed they admit that they observed the recitation of that fact in the agreement and made some inquiries about it. Even if the information they received from Kelly, in response to their inquiries, were admissible, their position would not be improved. Regarding Kelly as the complainant's agent, certainly any declarations made by him as to the extent of his agency could not be binding on the complainant, *Western Security Co. v. Douglass,* 14 Wash. 215, and it would seem clear that if the defendants chose to rely upon Kelly's statement, in substance to the effect that Clara E. Strey was a dummy, in spite of the fact that the document he was asking them to execute, to accomplish an extension of their loan, described her as "the legal owner and holder" of the note involved, they did so at their peril. Being charged with notice that complainant was the legal owner and holder of their note, this mortgage, under the renewal agreement, should not be affected by any prior dealings the defendants had had with Kelly, representing the association.

In order to hold that the payments by the defendants to Kelly were effective as payments to the complainant, it must be found either that Kelly was in fact authorized by the complainant to receive those payments or that he was put in such apparent authority

by acts of the complainant as would preclude or estop her from now denying his authority. *Stockton v. Fortune*, 82 Ill. App. 272. In many respects the facts involved in the case cited were similar to those involved in the case at bar.

That Kelly was authorized by the complainant to collect the interest on her loan as it fell due is clearly shown by the evidence. But that fact, in and of itself, would not afford ground for inferring authority in him to collect the principal, where he was not shown to have been intrusted by complainant with possession of the principal note. Jones on Mortgage, par. 964; *Joy v. Vance*, 104 Mich. 97; *Trowbridge v. Ross*, 105 Mich. 598; *Wilson v. Campbell*, 110 Mich. 580; *Trull v. Hammond*, 71 Minn. 172; *Security Co. v. Graybeal*, 85 Iowa 543; *Smith v. Kidd*, 68 N. Y. 130. Even if he had been shown to have possession of the principal note, in the absence of evidence showing the existence of a general agency with full powers to do all things in and about the handling of this loan, such possession could only imply authority in the agent to receive payment of the same, when it fell due. *Park v. Cross*, 76 Minn. 187; *Schermerhorn v. Farley*, 58 Hun 66, 11 N. Y. Supp. 466. An agent authorized merely to collect the interest on a mortgage loan has no implied authority to receive payment of the principal, and authority to collect the principal when due gives the agent no right to receive payment before maturity of the debt. 27 Cyc. 1389; *Park v. Cross, supra; Schermerhorn v. Farley, supra.*

Of course the rule might be otherwise in a case establishing a general agency on the part of the one making the collections for his principal, who was the owner of the securities, the agent having been shown to have full powers in handling the loan, including the collection of both the interest and the principal. That was the situation in *Noble v. Nugent*, 89 Ill. 522. A similar situation was disclosed in *Thornton v. Lawther,*

169 Ill. 228. In the latter case, as in the case at bar, the payment involved was made before the debt was due and the court passed on the question of whether the agent had authority to receive such payment and thereby bind his principal. The court said: "It is well settled that authority to an agent to receive payment of a debt is not, of itself, authority to do so before it falls due. (Mechem on Agency, sec. 380, and cases in note 1; *Thompson v. Elliott,* 73 Ill. 221.) 'But if there be a known usage of trade or course of business in a particular employment, or habit of dealing between the parties, extending the ordinary reach of authority, that may well be held to give full validity to the act.' (Story on Agency, sec. 98,—cited and approved in *Thompson v. Elliott, supra.*)" The court then observed that the evidence showed that the principal, who was the owner of the securities, had reposed in his agent Griggs a confidence seldom found in the business world, giving him full authority to negotiate loans on real estate, and trusting implicitly to his judgment with regard to such loans. On this point the court said that it appeared from the evidence that Griggs "could collect the principal at maturity or extend the time of payment, as he saw fit. In making a loan he determined the time it should run; passed upon the title; was made trustee in the mortgage; retained possession of the papers during the life of the loan," and that "with all this authority conceded and its scope not limited by any definite writing or language, but in the most general way, with power to fix the date of maturity and lengthen or postpone it, with power to reloan the principal when paid," it could not reasonably be said that the course of business and habit of dealing between the parties did not so extend the ordinary reach of the authority of Griggs as to give validity to his act of receiving payment before the full maturity of the debt.

In the case at bar there is no such general agency

established as was shown by the evidence in the two cases last cited. Rather, the evidence shows that the defendants had notice that Kelly did not have the powers of a general agent, for it became evident to them that he did not have power to extend the loan himself, when he presented a written agreement to them, covering that extension, in which the complainant appeared as party of the first part agreeing to such extension and was described as the legal owner and holder of their note.

The defendants had the burden of establishing the authority of Kelly to receive payment on the principal before maturity. Jones on Mortgages, par. 964a. There is no evidence whatever in the record on the question of any express authority, to that effect, from the complainant to Kelly, and the only implied authority, shown by the evidence as a result of the course pursued by Kelly and the complainant, indicated that his authority was not unlimited. In my opinion, the only authority on his part which could be implied from the course of dealing of the parties, as shown by the evidence, was an authority to collect the interest on the note as it fell due. That being the case, there is nothing which can operate to preclude the complainant from setting up the true situation as to the extent of the authority of Kelly, with regard to collecting money due on this mortgage, and from the evidence in this record it seems to me to be clear that such payments as the defendants may have made to him, to apply on the principal of their note before its maturity under the terms of the extension agreement, no provision having been made for such payments, either in the note itself or in the extension agreement, were made by them at their peril and the complainant cannot be bound by them.